# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL No. 2724<br>No.  16-MD-2724<br>HON. CYNTHIA M. RUFE |
| IN RE: PRAVASTATIN CASES | |
| THIS DOCUMENT RELATES TO<br>*ALL INDIRECT RESLLER PLAINTIFF (IRP) ACTIONS* | 16-PV-27243<br><br>**CLASS ACTION**<br>**JURY TRIAL DEMANDED** |

## INDIRECT RESELLER PLAINTIFFS'

## CLASS ACTION COMPLAINT

**FILED WITH REDACTIONS – PUBLIC VERSION**

## TABLE OF CONTENTS

PAGE

I.   NATURE OF THE ACTION ................................................................................ 1

II.  ONGOING FEDERAL AND STATE INVESTIGATIONS................................ 5

III. THE ROLE OF INDEPENDENT PHARMACIES......................................... 10

IV. JURISDICTION AND VENUE ..................................................................... 10

V.   PLAINTIFFS ................................................................................................. 12

     A.   Plaintiffs ............................................................................................. 12

     B.   Defendants ......................................................................................... 13

     C.   Co-conspirators ................................................................................. 15

VI. INTERSTATE AND INTRASTATE TRADE AND COMMERCE ................ 15

VII. BACKGROUND ON THE GENERIC DRUG INDUSTRY ......................... 16

     A.   Generic drugs are commodity products that compete on price................ 16

     B.   Pricing of generic drugs discourages unilateral price increases .............. 19

VIII. THE GENERIC PRAVASTATIN CONSPIRACY ........................................ 21

     A.   Congressional responses to generic Pravastatin price increases............ 21

     B.   The generic Pravastatin market....................................................... 24

     C.   generic Pravastatin price increases ................................................. 27

     D.   Activities with respect to the generic Pravastatin conspiracy................... 44

     E.   Defendants' opportunities to conspire ............................................... 45

     F.   Defendants' concerted efforts to increase prices for generic Pravastatin yielded supracompetitive profits................................................................ 48

          1.   Industry concentration ........................................................ 49

          2.   Barriers to entry .................................................................. 49

          3.   Demand inelasticity ............................................................ 50

          4.   Lack of substitutes .............................................................. 51

          6.   Inter-competitor contacts and communications ........................... 53

IX. THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS .............. 59

     A.   The Statutes of Limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy........................................ 59

     B.     Fraudulent concealment tolled the statutes of limitations.......................... 60

          1.     Active concealment of the conspiracy ........................ 61

          2.     Plaintiffs exercised reasonable diligence .................. 62

X.    CONTINUING VIOLATIONS .......................................................... 62

XI.   DEFENDANTS' ANTITRUST VIOLATIONS.................................. 63

XII.  CLASS ACTION ALLEGATIONS .................................................. 65

XIII.CAUSES OF ACTION ...................................................................... 69

XIV.      PRAYER FOR RELIEF ................................................... 112

XV. JURY DEMAND.............................................................................. 115

**FILED WITH REDACTIONS – PUBLIC VERSION**

## I.     NATURE OF THE ACTION

1.     This suit brings claims on behalf of indirect purchasers of generic Pravastatin Sodium tablets ("Indirect Reseller Plaintiffs," "independent pharmacies," or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic Pravastatin Sodium tablets ("Pravastatin").

2.     Pravastatin is a widely prescribed medication used to lower cholesterol.

3.     Pravastatin is one of a class of lipid-lowering compounds that reduce the biosynthesis of cholesterol. It belongs to a group of drugs known as HMG CoA reductase inhibitors, or "statins." It is a moderate-intensity statin. Pravastatin reduces the level of low-density lipoprotein and increases levels of high-density lipoprotein, thereby lowering levels of "bad" cholesterol and raising levels of "good" cholesterol, reducing the risk of heart attack and stroke.

4.     Pravastatin first became available in the United States as the brand name drug, Pravachol®, in 1991, and has been available in generic versions since 2006. When the Food & Drug Administration ("FDA") approved the generic version of Pravachol, it proclaimed that "its generic version can bring significant savings to the millions of Americans" at risk for cardiovascular disease. Since its approval, generic Pravastatin has historically sold at prices significantly less than the branded version. Those price benefits were decimated as a result of Defendants' collusion.

5.     Pravastatin is available orally in the form of tablets in 10, 20, 40 and 80 milligram dosages. As used herein, "Pravastatin" refers to generic versions of Pravachol, in tablet form at all dosage levels.

6.      The Centers for Disease Control and Prevention estimates that more than 35% of adults in the United States are eligible for cholesterol-lowering statins or are already taking them. By 2008, one-quarter of all adults over age 45 were taking statins, up from 2% in the early 1990s. According to *Pharmacy Times*, in 2012, Defendant Teva's generic Pravastatin product was the 25th most-prescribed drug in the United States. As of 2013, Pravastatin was the third most commonly prescribed cholesterol-lowering medication, with a market share of 14.5% of all drugs in the HMG-CoA class.[1]

7.      For years, competition among sellers of generic Pravastatin kept prices stable, at low levels. Prior to May 2013, Defendants sold 10, 20, and 40 mg Pravastatin tablets for approximately 10 cents per tablet, and 80 mg tablets for between 10 and 20 cents per tablet.

8.      That changed in mid-2013, when the prices Defendants charged for all dosages of Pravastatin skyrocketed abruptly and inexplicably. Between mid-2013 and early 2014, the price per tablet rose by between 30 and 60 cents, depending on the dosage. These price increases were extreme and unprecedented, elevating prices sharply and without explanation until finally coming to rest at substantially the same elevated level, an increase of some 300% to 600%. In fact, the U.S. Government Accountability Office ("GAO") identified Pravastatin as having "experienced an extraordinary price increase" in 2013-2014.[2] Even today, Pravastatin prices remain elevated.

9.      Defendants' unlawful and anticompetitive conduct in the Pravastatin market is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

---

[1] https://www.statista.com/statistics/311999/cholesterol-lowering-drugs-by-us-prescription-market-share/.

[2] GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 12, 2016) ("GAO Report"), at Appx. III, *available at* http://www.gao.gov/products/GAO-16-706.

**FILED WITH REDACTIONS – PUBLIC VERSION**

10.     The price increases imposed by Defendant manufacturers of generic Pravastatin cannot be explained by supply shortages or any other market feature or shock. Nor were they the result of unilateral business decisions. Instead, the significant increases in the prices of Pravastatin were the result of an illegal agreement among Defendants.

11.     ███████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

12.     Extreme and unprecedented price increases in the generic drug industry—including those imposed by manufacturers of Pravastatin—have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

13.     An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of doxycycline hyclate and glyburide. But DOJ has made clear that its "investigation is ongoing"[3] and the evidence uncovered during the course of its investigation into those drugs also "implicates…a significant number of the Defendants…[and] a significant number of the drugs at issue" in this Multidistrict Litigation.[4]

_____

[3] DOJ, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

[4] Intervenor United States' Motion to Stay Discovery at 1-2 (May 1, 2017) (ECF No. 279).

**FILED WITH REDACTIONS – PUBLIC VERSION**

14. The Attorney General for the State of Connecticut ("Connecticut AG"), whose office has been pursuing an investigation of the generic drug industry parallel to that of DOJ, confirms that its price-fixing investigation extends "way beyond the two drugs and the six companies. Way beyond... We're learning new things every day."[5] There is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States...[and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[6]

15. Manufacturers of generic Pravastatin are implicated in these ongoing investigations; at least two of the Defendants named here, Teva, and Zydus, have received a federal grand jury subpoena and/or an investigative demand from the Connecticut AG as part of the generic drug price-fixing investigations. What is more, in addition to DOJ's and Connecticut AG's investigations, members of Congress have requested information from various generic manufacturers, including Defendants Apotex, Teva, and Zydus, concerning Pravastatin specifically, among various other drugs. Finally, a "2015 Global Cartel Enforcement Report," published in January of 2016 by the law firm Morgan Lewis, identified Pravastatin as one of the "generic drugs at issue" in the investigations being conducted by DOJ and state Attorneys General.

16. Plaintiffs have paid many millions of dollars more than they would have in a competitive market for generic Pravastatin.

17. Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth

---

[5] "How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices," Kaiser Health News (Dec. 21, 2016), *available at* http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices.

[6] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

**FILED WITH REDACTIONS – PUBLIC VERSION**

below. Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of all privately held pharmacies in the United States and its territories that indirectly purchased generic Pravastatin products manufactured by any Defendant, from May 1, 2013 to the present ("Class Period"), and (b) a damages class of all privately-held pharmacies in certain states that indirectly purchased generic Pravastatin products manufactured by any Defendant, from May 1, 2013 to the present.

## II.   ONGOING FEDERAL AND STATE INVESTIGATIONS

18.     Now in its third year, the federal criminal investigation into generic drug price-fixing has begun to bear fruit. On December 12 and 13, 2016, DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (CEO) and Jason Malek (President). The government alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline hyclate in violation of the Sherman Act (15 U.S.C. § 1).[7]

19.     On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[8] Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained: "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by

---

[7] Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

[8] *See* Tr. of Plea Hearing, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also* Tr. of Plea Hearing, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24).

**FILED WITH REDACTIONS – PUBLIC VERSION**

the market, not by collusion."[9] As they await sentencing, Glazer and Malek are cooperating with DOJ's continuing investigation. More criminal charges and guilty pleas are expected to follow.[10]

20.     Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much, much broader. The investigations reportedly cover two dozen drugs and more than a dozen manufacturers.[11] Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[12]

21.     According to one report, prosecutors see the investigation of the generic drug industry much like DOJ's antitrust probe of the auto parts industry, which has morphed into DOJ's largest criminal antitrust probe ever. *See In re Automotive Parts Antitrust Litig.*, No. 2:12-md-02311 (E.D. Mich.). As in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[13]

22.     DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least sixteen generic drug manufacturers as part of the growing investigation, including: Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma USA, Inc. ("Aurobindo");

---

[9] DOJ Press Release (Dec. 14, 2016) *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

[10] *See, e.g.,* Eric Kroh, "Generic Drug Price-Fixing Suits Just Tip Of The Iceberg," Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"), *available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg.

[11] David McLaughlin & Caroline Chen, "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," Bloomberg (Nov. 3, 2016) *available at* http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

[12] PaRR Report, "DoJ Believes Collusion over Generic Drug Prices Widespread" (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

[13] *Id.*

**FILED WITH REDACTIONS – PUBLIC VERSION**

Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Heritage Pharmaceuticals, Inc. ("Heritage"); Impax Laboratories, Inc. ("Impax"); Lannett Company, Inc. ("Lannett"); Mayne Pharma, Inc. ("Mayne"); Mylan Inc. ("Mylan"); Par Pharmaceutical, Inc. ("Par"); Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc. ("Sandoz"); Sun Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva"); and Zydus Pharmaceuticals USA, Inc. ("Zydus").[14]

23.    The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant. DOJ does not empanel grand juries lightly. The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[15]

24.    As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the

---

[14] Further discussion of these generic drug manufacturers and their receipt of subpoenas or other inquiries from DOJ is included *infra* at ¶129.

[15] DOJ, Antitrust Division Manual (5th ed. 2015) at Chapter III-81 to 83, *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[16]

25.     Another significant indication of criminal price-fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant: "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[17] As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[18]

26.     In addition to the federal criminal investigation, the Connecticut AG began an investigation in July 2014 into the dramatic price increases in generic drugs. Now joined by the Attorneys General of 43 other states and the District of Columbia, the Connecticut AG has filed a civil complaint in the U.S. District Court for the District of Connecticut alleging price-fixing and customer allocation. Although the States' present complaint focuses on two drugs (doxycycline hyclate delayed release and glyburide), the States make clear that they have "uncovered wide-

---

[16] Mark Rosman & Seth Silber, "DOJ's Investigation Into Generic Pharma Pricing Is Unusual," Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

[17] Richard Vanderford, "Generic Pharma Investigation Still Broad, Prosecutor Says," mLex (Feb. 21, 2017).

[18] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available at* https://www.justice.gov/atr/page/file/926521/download.

**FILED WITH REDACTIONS – PUBLIC VERSION**

ranging conduct implicating numerous different drugs and competitors" and suggest that additional drugs and manufacturers will be added "at the appropriate time."[19]

27.    The publicly available version of the State AG Complaint is heavily redacted. Among the obscured portions are the contents of conspiratorial communications, which the Connecticut AG has described as "mind-boggling."[20]  The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive communications. "Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors." This affords them opportunities to "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[21]

28.    The indictments and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg. The government investigations have uncovered the existence of "a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."[22] Plaintiffs do not yet have access to all of the information available to the government enforcement agencies. What is known is that all six Defendants, on the heels of industry events they jointly attended, raised Pravastatin prices to previously unheard-

---

[19] *State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 (VLB) (D. Conn.) (ECF No. 168 at ¶ 9) (State AG Amended Complaint).

[20] Mark Pazniokus, "How a small-state AG's office plays in the big leagues," CT Mirror (Jan. 27, 2017), *available at* http://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/.

[21] State AG Amended Compl. ¶ 7.

[22] State AG Amended Compl. ¶ 1.

FILED WITH REDACTIONS – PUBLIC VERSION

of levels—some 300% to 600%—without even proffering a competitive justification. It is clear that the large and unprecedented price increases for generic Pravastatin cannot be explained by normal, competitive market forces. The explanation is collusion.

### III.    THE ROLE OF INDEPENDENT PHARMACIES

29.    There are approximately 22,000 privately-owned independent pharmacies in the United States, as contrasted with chain drug stores such as CVS, Walgreens, and Rite Aid, and mass merchandiser or supermarket drug stores such as Wal-Mart, Target and Kroger. Over a billion prescriptions for U.S. patients are dispensed through independent pharmacies each year.

30.    The overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to Plaintiffs. Independent pharmacies rarely purchase generic drugs directly from the manufacturer, and instead acquire drugs almost exclusively from drug wholesalers such as McKesson Corp., Cardinal Health Inc., or AmerisourceBergen Corp. As one would expect, the wholesaler's price includes a percentage markup over the manufacturer's price. Independent pharmacies, lacking the sales volume heft and wholesaler relationships enjoyed by their much larger competitors, have no meaningful ability to negotiate these acquisition costs. They must pay the price the wholesaler charges. As a result, when drug manufacturers collude to allocate customers or raise the prices of generic drugs, independent pharmacies end up paying illegally inflated prices for those drugs.

### IV.    JURISDICTION AND VENUE

31.    Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

10

32.     This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

33.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

34.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b), (c) and (d); and 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here. According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[23]

35.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) marketed and sold Pravastatin throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business

---

[23] DOJ, Antitrust Division Manual at III-83.

**FILED WITH REDACTIONS – PUBLIC VERSION**

throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District. In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## V.     PLAINTIFFS

### A.     Plaintiffs

36.     Plaintiff West Val Pharmacy ("West Val") is a privately held independent pharmacy that has been in business since 1959 and is currently located at 5353 Balboa Boulevard in Encino, California. West Val Pharmacy indirectly purchased and continues to purchase Defendants' generic Pravastatin products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

37.     Plaintiff Halliday's & Koivisto's Pharmacy ("Halliday's") is an independent pharmacy located at 4133 University Boulevard in Jacksonville, Florida. Halliday's has served the Jacksonville community for over 50 years. Halliday's indirectly purchased and continues to purchase Defendants' generic Pravastatin products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

38.     Plaintiff Russell's Mr. Discount Drugs, Inc. ("Russell's") was a privately held independent pharmacy located at 334 Depot Street, in Lexington, Mississippi from the time of its opening in February 1986 until it sold the prescription drugs portion of its business to a pharmacy chain on July 14, 2016. Russell's indirectly purchased Defendants' generic Pravastatin products at supracompetitive prices during the class period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

FILED WITH REDACTIONS – PUBLIC VERSION

39.     Plaintiff Falconer Pharmacy, Inc. ("Falconer") is a privately held independent pharmacy located in Falconer, New York. Falconer Pharmacy indirectly purchased and continues to purchase Defendants' generic Pravastatin products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

40.     ~~Plaintiff Deal Drug Pharmacy ("Deal Drug") is a privately held independent pharmacy in Nashville, Tennessee. Deal Drug indirectly purchased and continues to purchase Defendants' generic Pravastatin products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.~~

41.     Plaintiff Chet Johnson Drug, Inc. ("Chet Johnson") is a privately held independent pharmacy in Amery, Wisconsin. Chet Johnson indirectly purchased and continues to purchase Defendants' generic Pravastatin products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

**B.      Defendants**

42.     Apotex Corp. ("Apotex") is a corporation with its principal place of business in Weston, Florida.  Apotex is a subsidiary of Apotex, Inc., a Canadian company with its principal place of business in Toronto, Canada. Apotex manufactures, markets, and sells various generic drugs.  During the Class Period, Apotex sold Pravastatin to purchasers in this District and throughout the United States.

43.     Defendant Glenmark Pharmaceuticals Inc. (USA) ("Glenmark") is a corporation with its principal place of business in Mahwah, New Jersey. Glenmark is a subsidiary of Glenmark Pharmaceuticals Limited, an Indian company with its principal place of business in Mumbai, India. Glenmark manufactures, markets, and sells various generic drugs. During the Class Period, Glenmark sold Pravastatin to purchasers in this District and throughout the United States.

FILED WITH REDACTIONS – PUBLIC VERSION

44.     Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a corporation with its principal place of business in Baltimore, Maryland. Lupin is a subsidiary of Lupin Limited, an Indian company with its principal place of business in Mumbai, India. Lupin manufactures, markets, and sells generic versions of brand pharmaceutical products. During the Class Period, Lupin sold Pravastatin to purchasers in this District and throughout the United States.

45.      Defendant Sandoz, Inc. (Sandoz) is a Colorado corporation with its principal place of business in Princeton, New Jersey. Sandoz is the United States affiliate of Sandoz International GmbH, a company organized and existing under the laws of Germany, with its principal place of business in Holzkirchen, Germany. Sandoz is responsible for the distribution of drugs developed and manufactured by Sandoz International GmbH. Together Sandoz and Sandoz International GmbH operate as the generic pharmaceuticals division of Novartis International AG, a global healthcare company based in Switzerland. During the Class Period,

Sandoz sold Pravastatin to purchasers in this District and throughout the United States.

46.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Pennsylvania-based corporation with its principal place of business in North Wales, Pennsylvania. Teva is a subsidiary of Teva Pharmaceutical Industries Limited, an Israeli company with principal place of business in Petach Tikva, Israel. Teva manufactures, markets, and sells various generic pharmaceutical products. During the Class Period, Teva sold Pravastatin to purchasers in this District and throughout the United States.

47.     Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a New Jersey corporation with its principal place of business in Pennington, New Jersey. Zydus is the United States subsidiary of Cadila Pharmaceuticals Limited, an Indian pharmaceutical company. Zydus manufactures, markets, and sells various generic pharmaceutical products. During the Class

**FILED WITH REDACTIONS – PUBLIC VERSION**

Period, Zydus manufactured and sold Pravastatin to purchasers in this District and throughout the United States

C.     **Co-conspirators**

48.     Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein. Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

VI.     **INTERSTATE AND INTRASTATE TRADE AND COMMERCE**

49.     During the Class Period, Defendants sold and distributed generic Pravastatin in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

50.     Defendants' and their co-conspirators' conduct, including the marketing and sale of generic Pravastatin, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

51.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, drug wholesalers within each state and territory were foreclosed from offering less expensive generic Pravastatin to Plaintiffs inside each respective state and territory. The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

FILED WITH REDACTIONS – PUBLIC VERSION

## VII.   BACKGROUND ON THE GENERIC DRUG INDUSTRY

### A.   Generic drugs are commodity products that compete on price

52.     Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[24] In 2015, generic drug sales in the United States were estimated at $74.5 billion.[25]

53.     According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[26] Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[27]

54.     In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[28] And that may be conservative. According to a Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[29]

---

[24] GPhA, *Generic Drug Savings in the U.S.* (2015) ("GPhA Report") at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[25] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[26] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

[27] *Id.*

[28] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/publication/21800.

[29] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**

Mature generic markets—like that of Pravastatin—typically have several manufacturers that compete for sales, hence keeping prices in check.

55.     Generic drug price competition provides enormous savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs. Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[30]

56.     The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585). The Act streamlines the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs. Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

57.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

58.     Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature. As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of

---

[30] GPhA Report at 1.

FILED WITH REDACTIONS – PUBLIC VERSION

price."[31]  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

59.     It is well-established that competition among generic manufacturers drives down price. Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales. When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the cheaper alternatives. Over time, the price of a generic drug approaches the manufacturers' marginal costs. As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:

**Generic Competition and Drug Prices**



Source:  FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

60.     When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share. A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a

---

[31] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf .

FILED WITH REDACTIONS – PUBLIC VERSION

price that is lower than the current market price in order to build its customer base. Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[32]

61.     When there are multiple generic manufacturers in an established generic market—as with generic Pravastatin—prices should remain low and stable, and should not increase significantly (and stay there) absent a market disruption or, as is the case here, anticompetitive conduct.

**B.     Pricing of generic drugs discourages unilateral price increases**

62.     In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (*e.g.*, a co-pay or co-insurance) if they are insured. The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies. These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

63.     Because the prices paid by purchasers of generic drugs differ at each level of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious. Marketwide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC"). NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to

---

[32] GAO Report at 23.

**FILED WITH REDACTIONS – PUBLIC VERSION**

acquire prescription . . . drugs."[33]  "NADAC is a simple average of the drug acquisition costs submitted by retail pharmacies."[34]  In effect, NADAC is "a single national average."[35]  Thus, NADAC is one way to track general price trends in the marketplace.

64.    While NADAC provides the average price level across all manufacturers of a given drug, other price measures are manufacturer-specific.  Drug manufacturers typically report benchmarks—like Wholesale Acquisition Cost ("WAC")—for their drugs, which are then published in compendia used by participants in the pharmaceutical industry.  The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported list price, which is sometimes subject to discounts.  In order track manufacturer-specific pricing, this complaint uses QuintilesIMS's National Sales Perspectives ("NSP") data, which "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and includes sales by manufacturers into various outlets.[36]

65.    When third-party payers (e.g., health plans) pay pharmacies to dispense drugs to their covered patients, the amount is typically determined with reference to a benchmark or list price like a WAC. Some third-party payers and PBMs have implemented their own individual caps—Maximum Allowable Costs ("MACs")—that set the maximum amounts they will pay pharmacies for some generic drugs, regardless of the pharmacies' acquisition costs. A pharmacy

---

[33] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[34] *Id.* at 15.

[35] *Id.*

[36] IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

must often dispense the drug at a loss if it cannot find a wholesaler offering the drug at a price or below the MAC cap.

66.     Although MAC caps do not apply directly to manufacturers, these caps impose a restraint on manufacturers' prices. The MAC cap essentially limits a pharmacy's' discretion to adjust retail prices upwards for a given drug, so pharmacies are incentivized to buy from the cheapest wholesaler and wholesalers to buy from the cheapest manufacturer. This additional pressure on prices means a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price. Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales.  In a market with MAC caps, it is unlikely that a generic drug manufacturer would risk raising its price unless it has been agreed with competitors that they will raise their prices, too.

## VIII.  THE GENERIC PRAVASTATIN CONSPIRACY

### A.     Congressional responses to generic Pravastatin price increases

67.     In addition to the investigations by DOJ and the Connecticut AG, Congress has raised concerns about the alarming price spikes for numerous generic pharmaceuticals—including Pravastatin specifically.

68.     As reflected in a chart compiled by Elijah E. Cummings, the former Ranking Member of the House Committee on Oversight and Government Reform and Senator Bernie Sanders, the former Chairman of the Subcommittee on Primary Health and Aging, prices for certain generic drugs, including Pravastatin, increased dramatically in 2013, with the price for a bottle of 500 10 mg Pravastatin tablets increasing 573%:

FILED WITH REDACTIONS – PUBLIC VERSION

| Drug | Use | Average Market Price Oct. 2013 | Average Market Price April 2014 | Average Percentage Increase |
|---|---|---|---|---|
| Doxycycline Hyclate (bottle of 500, 100 mg tablets) | antibiotic used to treat a variety of infections | $20 | $1,849 | 8,281% |
| Albuterol Sulfate (bottle of 100, 2 mg tablets) | used to treat asthma and other lung conditions | $11 | $434 | 4,014% |
| Glycopyrrolate (box of 10 0.2 mg/mL, 20 mL vials) | used to prevent irregular heartbeats during surgery | $65 | $1,277 | 2,728% |
| Divalproex Sodium ER (bottle of 80, 500 mg tablets ER 24H) | used to prevent migraines and treat certain types of seizures | $31 | $234 | 736% |
| Pravastatin Sodium (bottle of 500, 10 mg tablets) | used to treat high cholesterol and to prevent heart disease | $27 | $196 | 573% |
| Neostigmine Methylsulfate (box of 10 1:1000 vials) | used in anesthesia to reverse the effects of some muscle relaxants | $25 | $121 | 522% |
| Benazepril/Hydrochlorothiazide (bottle of 100, 20-25 mg tablets) | used to treat high blood pressure | $34 | $149 | 420% |
| Drug | Use | Average Market Price Nov. 2012 | Average Market Price Sept. 2014 | Average Percentage Increase |
| Isuprel (box of 25, 0.2 mg/mL vials) | used to treat heart attacks and irregular heartbeat | $916 | $4,489 | 390% |
| Nitropress (50 mg vial) | used to treat congestive heart failure and reduce blood pressure | $44 | $215 | 388% |
| Drug | Use | Average Market Price Oct. 2012 | Average Market Price June 2014 | Average Percentage Increase |
| Digoxin (single tablet, 250 mcg) | used to treat irregular heartbeats and heart failure | $0.11 | $1.10 | 884% |

69.     In the fall of 2014, Senator Sanders and Representative Cummings requested information from manufacturers of 10 drugs that had experienced extraordinary price increases. Six of those drugs are now the subject of complaints in this MDL.[37] In November 2014, Senator Sanders conducted a hearing entitled, "Why Are Some Generic Drugs Skyrocketing in Price?" ("Senate Hearing"). Various witnesses discussed the price hikes for generic drugs, but none of the

---

[37] Senator Sanders, Press Release, "Congress Investigating Why Generic Drug Prices Are Skyrocketing" (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

FILED WITH REDACTIONS – PUBLIC VERSION

industry executives that were invited to testify—including Arthur Bedrosian ("Bedrosian"), the CEO of Lannett, and Erez Vigodman, the CEO of Teva—appeared.[38]

70.     Senator Sanders and Representative Cummings followed up with a request to the Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking it to investigate the effect that price increases of generic drugs have had on the Medicare and Medicaid programs. The OIG issued its report in December 2015, confirming that price increases for numerous generic drugs far outpaced inflation.[39]

71.     In response to another Congressional request—this one from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner—the United States Government Accountability Office ("GAO") issued a report in August 2016 entitled "Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases."[40] The GAO investigation confirmed that in a competitive market, generic drug prices decline and remain stable, absent shortages or other market disruptions.[41] And this was the case for most generics. But it identified numerous drugs that experienced "extraordinary" increases, which it defined as an increase of more than 100%.[42] Pravastatin is among the drugs identified by the GAO, which concluded that Pravastatin, in both the 10mg and 40mg tablet form, "[e]xperienced an extraordinary price increase" in 2013-2014.[43]

---

[38] Senate Hearing (Nov. 20, 2014), *available at* https://www.help.senate.gov/hearings/why-are-some-generic-drugs-skyrocketing-in-priced.

[39] HHS OIG, *Average Manufacturer Prices Increased Faster than Inflation for Many Generic Drugs* (Dec. 2015), *available at* https://oig.hhs.gov/oas/reports/region6/61500030.pdf.

[40] GAO Report.

[41] *Id.* at 23-25.

[42] *Id.* at 1 & Appendix III.

[43] *Id.*

**FILED WITH REDACTIONS – PUBLIC VERSION**

### B.     The generic Pravastatin market

72.     Pravastatin is marketed and sold throughout the United States and its territories.

73.     At all relevant times, Defendants had substantial market power with respect to generic Pravastatin. Defendants exercised this power to maintain supracompetitive prices for Pravastatin without losing so many sales as to make the elevated price unprofitable.

74.     Defendants sold generic Pravastatin at prices in excess of marginal costs, in excess of a competitive price, and enjoyed high profit margins.

75.     Bristol Myers Squibb manufactures and sells a branded version of Pravastatin under the brand name Pravachol®. Bristol Myers Squibb received approval for Pravachol (NDA 019898) on October 31, 1991, and began selling its Pravastatin product soon thereafter. Pravachol was a blockbuster drug for Bristol Myers Squibb, generating $1.3 billion in sales in 2005 before generic forms of Pravastatin were approved by the FDA.

76.     Defendants are leaders in the market for generic drugs. Defendants Teva, Sandoz, and Lupin are among the top five U.S. corporations selling generic prescription drugs, with Teva leading the pack.

77.     Each Defendant manufactures, markets, and sells Pravastatin, entering the market after the FDA approved their respective ANDA applications:

    (a)   Apotex received approval to manufacture, market, and sell Pravastatin in October 2006.

    (b)   Glenmark received approval to manufacture, market, and sell Pravastatin in May 2007.

    (c)   Teva received approval to manufacture, market, and sell Pravastatin in April 2006.

    (d)   Lupin received approval to manufacture, market, and sell Pravastatin in January 2008.

FILED WITH REDACTIONS – PUBLIC VERSION

(e)   Sandoz received approval to manufacture, market, and sell Pravastatin in October 2006.

(f)   Zydus received approval to manufacture, market, and sell Pravastatin in April 2008.

78.   Sun Pharma's subsidiary, Ranbaxy Laboratories, also manufactured and sold generic Pravastatin in the United States through 2012. But significant compliance issues at one of Ranbaxy's Indian manufacturing plants resulted in the FDA withdrawing approval of 27 Ranbaxy ANDAs—including its ANDA for Pravastatin—as part of 2012 consent decree between Ranbaxy, the FDA, and the DOJ.

79.   By 2007, as Defendants were receiving their approvals, the U.S. market for Pravastatin tablets was estimated at $1.9 billion annually.[44]

80.   In 2013 and today, Defendants dominate the Pravastatin market. In 2013, when the price hikes were implemented, Apotex, Glenmark, Lupin, Teva, and Zydus collectively held approximately 98% of market for Pravastatin, with Teva accounting 58% of the market for 10, 20, and 40 mg tablets, and 56% of the market for 80 mg tablets.

---

[44] http://genericspatent.blogspot.kr/2008/05/zydus-cadila-gets-four-us-fda-approvals.html.

FILED WITH REDACTIONS – PUBLIC VERSION



2013 Market Share - Pravastatin Sodium (40mg)

Source: Symphony Health

81.     Defendants continued to dominate the market throughout the Class Period.

82.     Defendant Sandoz entered the Pravastatin market in early 2014 shortly after the price hikes were implemented.

83.     While there are a few smaller companies operating in the market, they do not now and have never posed a competitive threat to the Defendants or operated as a constraint on Defendants' pricing activities.

84.     The market for Pravastatin is mature, and drug manufacturers that operate in that market can only gain market share by competing on price. Yet, as demonstrated below, none of the Defendants chose to do so.

85.     Through their market dominance, Defendants have successfully foreclosed the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs supracompetitive prices for generic Pravastatin.

FILED WITH REDACTIONS – PUBLIC VERSION

### C.   Generic Pravastatin price increases

86.    There are no legitimate reasons or explanations for Defendants' unprecedented and dramatic price increases for Pravastatin.

87.    Prices for Pravastatin were stable (and low) for many years—hovering at or below 10 cents per 10, 20, 40 mg tablet, and between 10 and 20 cents for 80 mg tablets, from 2010 to mid-2013.

88.    As part of their conspiracy, Defendants agreed to raise the prices of Pravastatin sold in the United States, and beginning in or around June 2013, prices for Pravastatin soared.

89.    On October 2, 2014, Senator Sanders and Representative Cummings sent letters to a number of the Defendants.[45] The letter to Zydus, Teva, and Apotex contained this chart showing drastic increases in the average market prices of various dosages of and package sizes for Pravastatin between October 2013 and April 2014:

| Drug | SKU | Average Market Price, October 2013 | Average Market Price, April 2014 | Cost Increase | Percentage Increase |
|---|---|---|---|---|---|
| Pravastatin Sodium | bottle of 1000, 20mg tablets | $77 | $368 | $291 | 447% |
| Pravastatin Sodium | bottle of 1000, 40mg tablets | $114 | $540 | $426 | 528% |
| Pravastatin Sodium | bottle of 500, 10mg tablets | $27 | $196 | $169 | 573% |
| Pravastatin Sodium | bottle of 500, 80mg tablets | $59 | $299 | $240 | 365% |
| Pravastatin Sodium | bottle of 90, 10mg tablets | $6 | $34 | $28 | 420% |
| Pravastatin Sodium | bottle of 90, 20mg tablets | $7 | $35 | $28 | 446% |
| Pravastatin Sodium | bottle of 90, 40mg tablets | $9 | $51 | $42 | 473% |
| Pravastatin Sodium | bottle of 90, 80mg tablets | $14 | $52 | $39 | 334% |

---

[45] The October Letters may be found at http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

FILED WITH REDACTIONS – PUBLIC VERSION

90.     The National Average Drug Acquisition Cost ("NADAC") data[46] for Pravastatin likewise illustrates this drastic increase. The NADAC data show the average increase in the price of Pravastatin across the major manufacturers and demonstrate that price hikes for Pravastatin were industry-wide. For example, NADAC data for the 10 mg dosage of Pravastatin sodium manufactured and sold by Defendants Teva, Glenmark, Lupin (Cadila), Sandoz (Lek), and Apotex depict the following:



---

[46] The NADAC data is a pricing reference file published by the Centers for Medicare and Medicaid Services that is based on average actual acquisition costs of various outpatient drugs collected from a monthly survey of retail community pharmacies across the United States.

FILED WITH REDACTIONS – PUBLIC VERSION

91.    NADAC data for the 20, 40, and 80 mg dosages illustrate similar hikes:





**FILED WITH REDACTIONS – PUBLIC VERSION**



**FILED WITH REDACTIONS – PUBLIC VERSION**

92.     As the following charts demonstrate, the increase in average prices was not the result of one dominant manufacturer raising the price while others kept prices in check. Five of the six Defendants raised their prices for all dosages of Pravastatin dramatically and in near lockstep beginning in mid-2013, causing prices to rise between ***300 and 600 percent***, depending on the dosage, and breaking with the flat pricing of the preceding years. Defendant Sandoz entered the Pravastatin market in early 2014 and, rather than pricing below that of the incumbents to capture market share, it sold Pravastatin at prices comparable to that of its co-conspirators when it entered, or soon thereafter.



31



93. **Glenmark:** For over two years before the Class Period began, the average effective price per unit of its products was: ███████████████████████████████████

████████████████████████████

94. In April 2013 its effective prices were essentially the same.  But in May 2013, it began a drastic increase of its effective prices:

| Product | Price Apr. 2013 | Hike Date | Hike Price | Percentage Increase |
|---------|-----------------|-----------|------------|---------------------|
| TAB 10GM | | | | |
| TAB 20GM | | | | |
| TAB 40GM | | | | |
| TAB 80GM | | | | |

95. Glenmark's effective prices would continue to climb, peaking a few months later, increasing as much as ████ above its pre-conspiracy price levels:

| Product | Price Date | Peak Price | Percentage Increase |
|---------|-----------|------------|---------------------|
| TAB 10GM | | | |
| TAB 20GM | | | |
| TAB 40GM | | | |
| TAB 80GM | | | |

96. Even today, Glenmark's effective prices remain unexpectedly high and would not have remained so high but for the price-fixing conspiracy. For example, in November 2016, its prices are as much as ████ higher than in April 2013:

| Product | Price Apr. 2013 | Price Nov. 2016 | Percentage Increase |
|---------|-----------------|-----------------|---------------------|
| TAB 10GM | | | |
| TAB 20GM | | | |

**FILED WITH REDACTIONS – PUBLIC VERSION**

| TAB 40GM | |
|---|---|
| TAB 80GM | |

97.     **Apotex:** For over two years before the Class Period began, the average effective price per unit of its products was: ████████████████████████████

████████████████     80g tablet.

98.     In April 2013 its effective prices were about three cents lower. But in July and August 2013, it began a drastic increase of its effective prices:

| Product | Price Apr. 2013 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| TAB 10GM | | | | |
| TAB 20GM | | | | |
| TAB 40GM | | | | |
| TAB 80GM | | | | |

99.     Apotex's effective prices would continue to climb, peaking later that year and increasing as much as ████ above its pre-conspiracy price levels:

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| TAB 10GM | | | |
| TAB 20GM | | | |
| TAB 40GM | | | |
| TAB 80GM | | | |

100.    Even today, Apotex's effective prices remain unexpectedly high and would not have remained so high but for the price-fixing conspiracy. For example, in November 2016, its prices are as much as ████ higher than in April 2013:

**FILED WITH REDACTIONS – PUBLIC VERSION**

| Product | Price Apr. 2013 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| TAB 10GM | | | |
| TAB 20GM | | | |
| TAB 40GM | | | |
| TAB 80GM | | | |

101.   **Lupin:** For over two years before the Class Period began, the average effective price per unit of its products was ███████████████████████████████████ ████████████████ for its 80g tablet.

102.   In April 2013 its effective prices were roughly the same. But in July and September of 2013, it began a drastic increase of its effective prices:

| Product | Price Apr. 2013 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| TAB 10GM | | | | |
| TAB 20GM | | | | |
| TAB 40GM | | | | |
| TAB 80GM | | | | |

103.   Lupin's effective prices would continue to climb, peaking later that year and increasing as much as ██████ above its pre-conspiracy price levels:

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| TAB 10GM | | | |
| TAB 20GM | | | |
| TAB 40GM | | | |
| TAB 80GM | | | |

**FILED WITH REDACTIONS – PUBLIC VERSION**

104.    Even today, Lupin's effective prices remain unexpectedly high and would not have remained so high but for the price-fixing conspiracy. For example, in November 2016, its prices are as much as ▆▆▆▆▆▆▆▆▆▆▆▆▆

| Product | Price Apr. 2013 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| TAB 10GM | | | |
| TAB 20GM | | | |
| TAB 40GM | | | |
| TAB 80GM | | | |

105.    **Teva:** For over two years before the Class Period began, the average effective price per unit of its products was: ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

106.    In April 2013 its effective prices were slightly lower. But in August 2013, it began a drastic increase of its effective prices:

| Product | Price Apr. 2013 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| TAB 10GM | | | | |
| TAB 20GM | | | | |
| TAB 40GM | | | | |
| TAB 80GM | | | | |

107.    Teva's effective prices would continue to climb, peaking later that year and in 2014 and increasing as much as ▆▆▆ above its pre-conspiracy price levels:

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| TAB 10GM | | | |
| TAB 20GM | | | |

36

**FILED WITH REDACTIONS – PUBLIC VERSION**

| | | | |
|---|---|---|---|
| TAB 40GM | | | |
| TAB 80GM | | | |

108.    Even today, Teva's effective prices remain unexpectedly high and would not have remained so high but for the price-fixing conspiracy. For example, in November 2016, its prices are as much as ▆▆▆▆ higher than in April 2013:

| Product | Price Apr. 2013 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| TAB 10GM | | | |
| TAB 20GM | | | |
| TAB 40GM | | | |
| TAB 80GM | | | |

109.    **Sandoz**: Sandoz did not enter the Pravastatin market until after the Class period began. Instead of competing on price, it entered the market at supracompetitive prices, comparable to the other Defendants. Likewise, even today its prices are far above Defendants' pre-conspiracy prices.

110.    **Zydus**: Over the same pre-Class period, Zydus's prices were less stable than the other Defendants, having attempted a premature drive in 2011 to cause Pravastatin prices to skyrocket.  By 2012 its prices stabilized and tracked the other Defendants' prices.  In April 2013, the last month of the pre-conspiracy period, its effective prices were approximately the same as the other Defendants:

37

FILED WITH REDACTIONS – PUBLIC VERSION

111.    But by June and July of 2013, just one to two months into the Class Period,

Zydus's effective prices had doubled:



**FILED WITH REDACTIONS – PUBLIC VERSION**



39
FILED WITH REDACTIONS – PUBLIC VERSION



112.    Zydus's effective prices would continue to climb in 2013, peaking later that year and in 2014 and increasing as much as ▮▮▮▮ above its pre-conspiracy price levels:

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| TAB 10GM | | | |
| TAB 20GM | | | |
| TAB 40GM | | | |
| TAB 80GM | | | |

113.    Even today, Zydus's effective prices remain unexpectedly high and would not have remained so high but for the price-fixing conspiracy. For example, in November 2016, its prices are as much as ▮▮▮ higher than in April 2013:

| Product | Price Apr. 2013 | Price Nov. 2016 | Percentage Increase |
|---------|-----------------|-----------------|---------------------|
| TAB 10GM | | | |
| TAB 20GM | | | |
| TAB 40GM | | | |
| TAB 80GM | | | |

114.    The sustained price elevation reflected in the data, across Pravastatin in various dosages, was the result of a conspiracy among Defendants to allocate customers, rig bids, and artificially raise, fix, maintain, and/or stabilize the price of Pravastatin sold in the United States.

115.    These extraordinary price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions. There were no relevant labelling changes or reported drug shortages that might have led to price increases. Nor was there a spike in demand that could explain the price hikes. Indeed, the price of other statins, including other moderate-intensity statins, did not experience dramatic price increases at or around the same time:

**FILED WITH REDACTIONS – PUBLIC VERSION**



116.    Prior to the 2013 price hikes, the quantity of Pravastatin sold and the total associated Pravastatin revenue moved in tandem. After the price hike, however, Defendants reaped enormous profits from Pravastatin while the actual quantity sold remained comparatively static, in defiance of previous competitive norms.

117.    Federal law requires drug manufacturers to report potential drug shortages to the FDA, the reasons therefor, and the expected duration of the shortage. The Defendants reported no Pravastatin-related supply disruptions or shortages to the FDA during the relevant period. The American Society of Health-System Pharmacists, which maintains bulletins of current and resolved drug shortages, likewise has no record of a Pravastatin shortage during the relevant period.

118.    And because generic pharmaceutical manufacturers do not need to incur the large research and development costs that brand manufacturers absorb in developing new drugs, the price increases cannot be attributed to the need to fund research and development. Indeed,

42

FILED WITH REDACTIONS – PUBLIC VERSION

Pravastatin had been available in generic form for nearly a decade at the time of the 2013 price spikes.

119.    Industry analysts have also suggested that recent price increases for Pravastatin and other generic drugs are the result of collusion among manufacturers. Richard Evans at *Sector & Sovereign Research* wrote in 2015: "[a] plausible explanation [for price increases of generic drugs] is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation."[47]

120.    This abrupt shift in the pricing of Pravastatin has had a catastrophic effect on patients, particularly those with life-threatening cardiac conditions, and has caused pharmacies to suffer losses due to MAC caps. As noted in letters sent to generic drug manufacturers as part of a Congressional investigation into unexplained price increases:

> This dramatic increase in generic drug prices results in decreased access for patients. According to the National Community Pharmacists Association (NCPA), a 2013 member survey found that pharmacists across the country "have seen huge upswings in generic drug prices that are hurting patients and pharmacies ability to operate" and "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price." These price increases have a direct impact on patients' ability to purchase their needed medications. The NCPA survey found that "pharmacists reported patients declining their medication due to increased co-pays," and "84% of pharmacists said that the acquisition price/lagging reimbursement trend is having a 'very significant' impact on their ability to remain in business to continue serving patients." (Footnotes omitted).[48]

---

[47] http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

[48] The letters sent to generic drug manufacturers may be found at http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

**FILED WITH REDACTIONS – PUBLIC VERSION**

121.    And, as the AARP reported:[49]

> When Carol Ann Riha, 57, filled her prescription for the generic
> cholesterol-lowering drug Pravastatin, she was in for sticker shock.
> For months she'd been paying $4 for a 30-day supply. Suddenly the
> price had climbed more than four times as high, to nearly $19. "I
> asked my pharmacist why, and she had no answer," says Riha, a
> retired journalist who lives with her husband in West Des Moines,
> Iowa.

122.    Although Pravastatin prices began easing somewhat in late 2014, they remained

well above their levels prior to the conspiracy and Defendants continue to enjoy supracompetitive

profits today. Defendants' price increases for Pravastatin resulted in corresponding increases to

the prices paid by Plaintiffs and members of the proposed Classes. Corresponding increases in

Pravastatin's transactional prices demonstrate that increased WAC prices translate to increases in

the prices paid by Plaintiffs.

**D.      Activities with respect to the generic Pravastatin conspiracy**

123.    Defendants' sudden and massive price increases represented a sharp departure from

the previous years of low and stable prices.

124.    During the Class Period and beginning in or around 2013, the Defendants, through

their sales representatives and senior management, met in person and/or otherwise communicated

by phone, email, text message, and other means to discuss pricing and pricing strategies for

Pravastatin, ultimately agreeing to forgo competition, allocate customers and business segments,

rig bids, and fix the prices at which Pravastatin would be sold in its various dosages. This unlawful

agreement accounts for the sharp and otherwise unexplained break in the Defendants' historic

Pravastatin price levels, beginning in or around June 2013.

---

[49] http://www.aarp.org/health/drugs-supplements/info-2015/prices-spike-for-generic-
drugs.html.

**FILED WITH REDACTIONS – PUBLIC VERSION**

### E.     Defendants' opportunities to conspire

125.     In order to be successful, collusive agreements require a level of trust among the conspirators. While this can be accomplished by one-on-one communications, collaboration is also fostered through industry associations, which facilitate relationships between individuals who should otherwise be predisposed to compete vigorously with each other.

126.     The Defendants had numerous opportunities to meet and conspire at various public and private functions immediately before and during the Class Period—and seized those opportunities to reach their unlawful anticompetitive agreement and, later, to facilitate that agreement.

127.     As alleged by the state AGs, "the defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences and other events . . . ."[50]

128.     The Defendants frequently met during and immediately before the Class Period at conferences held by their customers, such as wholesalers or distributors (McKesson, AmeriSourceBergen Corporation, Cardinal Health, Inc., H.D. Smith, LLC, and Morris & Dickson, LLC), GPOs (Econdisc, Vizient, Premier, Inc., Intalere, and Minnesota Multistate Contracting Alliance for Pharmacy), and retailers (such as Rite Aid Corporation, the Walgreen Company, Wal-Mart Stores, Inc., Target Corporation, and Publix Super Markets, Inc.).

129. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

---

[50] http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

**FILED WITH REDACTIONS – PUBLIC VERSION**

130.    In addition, the Defendants and their supposed competitors hosted numerous private industry dinners attended by high-level generic pharmaceutical manufacturer executives during and immediately before the Class Period. A January 2014 dinner featured 13 high-ranking executives from a number of manufacturers, including some of the Defendants. And there were regular meetings and dinners attended by female generic pharmaceutical sales representatives that were known as "Girls Night Out" ("GNOs") or "Women in Industry" events. ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████

131.    Finally, Defendants also met through trade associations, including the GPhA, which describes itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."[51] Past and current members of the GPhA include all six defendants. Members "are corporations, partnerships or other legal entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[52] Several of Defendants' high-ranking officers serve on GPhA's Board of Directors including Apotex's Jeff Watson, who serves as

---

[51] http://www.gphaonline.org/about/the-gpha-association.
[52] http://www.gphaonline.org/about/membership.

Chairman, Glenmark's Robert Matsuk, Lupin's Paul McGarty, Sandoz's Peter Goldschmidt, Teva's Andrew Boyer (and previously Teva's Debra Barrett), and Zydus's Joseph Renner.

132.    Representatives from the Defendants frequently attended periodic meetings held by GPhA. As noted in the charts above, the price hikes for Pravastatin commenced in mid-2013. The GPhA 2013 Annual Meeting was held in Orlando, Florida on February 19-21, 2013. Representatives of every Defendant attended that meeting, [53] providing the opportunity to meet, discuss, and reach agreement. On information and belief, during that event, Defendants discussed Pravastatin pricing in furtherance of their conspiracy.

133.    Defendant representatives jointly attended other meetings held by GPhA as well, affording them ample opportunities for discussions in furtherance of their conspiracy. The following table lists just some of the GPhA meetings attended by Defendants' representatives during the relevant period:

| Meeting | Meeting Date & Location | Defendant Attendees |
|---|---|---|
| 2012 GPhA Fall Technical Conference | October 1-3, 2012, Bethesda, Maryland | Apotex, Glenmark, Lupin, Teva, Zydus |
| 2013 GPhA CMC Workshop | June 4-5, 2013, Bethesda, Maryland | Glenmark, Teva, Zydus |
| 2013 GPhA Fall Technical Conference | October 28-30, 2013, Bethesda, Maryland | Apotex, Glenmark, Lupin, Teva, Zydus |
| 2014 GPhA Annual Meeting | February 19-21, 2014 Orlando, Florida | Apotex, Lupin, Teva, Zydus |
| 2014 GPhA CMC Workshop | June 3-4, 2014 Bethesda, Maryland | Apotex, Glenmark, Lupin, Teva, Zydus |

---

[53] http://www.gphaonline.org/index.php/events/2013-annual-meeting-past-attendees.

FILED WITH REDACTIONS – PUBLIC VERSION

F. **Defendants' concerted efforts to increase prices for generic Pravastatin yielded supracompetitive profits**

134.     Defendants' agreement to allocate customers, rig bids, and fix the price of Pravastatin resulted in increased revenues and higher profits.

135.     Defendants' combined total Pravastatin sales revenues increased by nearly 500% between 2013 and 2015. In 2012, the combined annual sales of Pravastatin in the United States for Defendants Apotex, Glenmark, Lupin, Teva and Zydus was approximately $109 million before skyrocketing to nearly $300 million in 2013 and more than $500 million in 2014. In the first quarter of 2014, when the Pravastatin price hikes were complete, Teva reported it enjoyed 17% growth in the U.S. generic market compared to the first quarter of 2013 and that its profitability was driven by its global generics business, with 31% improvement resulting from the strong performance in the U.S. market, resulting in its generics business contributing 30% to its total profit.[54]

G. **Factors increasing the market's susceptibility to collusion**

136.     Publicly available data on the generic Pravastatin market in the United States demonstrate that it is susceptible to collusion by Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

---

[54] Teva Pharmaceutical's CEO Discusses Q1 2014 Results; Earnings Call Transcript, https://seekingalpha.com/article/2185153-teva-pharmaceuticals-ceo-discusses-q1-2014-results-earnings-call-transcript?page=2.

**FILED WITH REDACTIONS – PUBLIC VERSION**

### 1.   Industry concentration

137.   A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.

138.   In the United States Pravastatin market, at the time of the conspiracy, the Defendants named here accounted for the vast majority of sales of Pravastatin, nearly 100% of the market. This remained true throughout the Class Period.

139.   While the market for Pravastatin is sufficiently concentrated to facilitate collusion, the years of low and stable pricing in the market establish that the number of manufacturers in the market was sufficient to drive competition. Absent collusion, prices would have remained at competitive levels.

140.   No market exit by a Pravastatin manufacturer can explain the price increases either.

141.   Defendants have been able to maintain supracompetitive prices for Pravastatin without significant loss of market share to non-conspirators. Thus, Defendants have oligopolistic market power in the market for Pravastatin.

142.   The magnitude of Defendants' price increases for Pravastatin distinguishes them from non-collusive oligopolistic pricing. Non-collusive oligopolistic pricing would be expected to proceed incrementally, as manufacturers test the waters to see if competitors will follow a price increase. But here the increases are extreme – jumping as much as 300-600% in one fell swoop. Such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase.

### 2.   Barriers to entry

143.   Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence

of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

144.    There are significant capital, regulatory, and intellectual property barriers to entry in the generic Pravastatin markets that make such entry time-consuming and expensive.

145.    Start-up costs and regulatory oversight represent substantial barriers to entry in the generic Pravastatin markets.

146.    In addition to the significant out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time. As Kansas Senator Jerry Moran commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years."[55] This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

### 3.    Demand inelasticity

147.    A product exhibits completely inelastic demand if buyers will continue to buy it regardless of the price. No product is completely inelastic, but prescription medicines come close.

148.    Demand for Defendants' Pravastatin products is inelastic largely because, while they are somewhat interchangeable with one another, they cannot be substituted for other products given their pharmacological characteristics.   Additionally, the incentives of actors in the Pravastatin market are not sensitive to price, as they are in most other markets. Doctors who prescribe Pravastatin have the best therapy and not the cheapest cost in mind; patients cannot write

---

[55] Senator Moran, Statement (Sep. 21, 2016), *available at* http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

themselves a prescription for a cheaper substitute or comfortably forgo treatment; and pharmacies have no choice but to fill the prescription as written. When Defendants increased their Pravastatin prices, independent pharmacies could not simply purchase and dispense less-expensive alternative products.

149.    In order for a cartel to profit from raising prices above competitive levels, demand must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made. Otherwise, increased prices would result in declining sales, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

### 4.    Lack of substitutes

150.    Pravastatin has no viable substitutes. Other statins are not reasonable substitutes because they have different chemistry, pharmacokinetics, potency, and approved indications as compared to Pravastatin. As a result, other statins, such as atorvastatin (Lipitor), rosuvastatin (Crestor), and simvastatin (Zocor), are not therapeutically equivalent to Pravastatin. This lack of viable substitutes for Pravastatin is evidenced by data showing that during the Class Period, patients (and their prescribing physicians) did not switch from Pravastatin to another statin despite significant price increases.

151.    Branded Pravastatin does not serve as an economic substitute for generic Pravastatin either. This is because branded products generally maintain substantial price premiums over their generic counterparts, making them inapt substitutes even when generic prices soar. For example, as the chart presented *supra* comparing prices of different statins over the Class Period demonstrates, other lipid control drugs do not constrain the prices of Pravastatin. Indeed, even

**FILED WITH REDACTIONS – PUBLIC VERSION**

compounds within the same drug class (here, statins) have no apparent effect on the prices of Pravastatin. No other statin's prices moved similarly to Pravastatin's prices. Further, the relatively low prices of these other statins had little effect on Pravastatin prices, which remained at or above $0.45 per tablet or *three times* the prices for atorvastatin, simvastatin, and lovastatin. These price trends confirm that other statins do not serve as competitive restraints on Defendants' pricing of Pravastatin.

152.    Thus, purchasers of generic Pravastatin were held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices, rig bids, and allocate markets and customers.

### 5.    Standardized product with high degree of interchangeability

153.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

154.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug. This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

155.    Defendants' generic Pravastatin products are bioequivalent across manufacturers and bioequivalent to the branded counterpart, which enables pharmacists to substitute them (any of them) widely.

**FILED WITH REDACTIONS – PUBLIC VERSION**

156.     Moreover, because generic Pravastatin products are interchangeable, there is little utility in attempting to distinguish the products based on quality, branding or service. Accordingly, manufacturers generally spend little effort advertising or detailing (the practice of providing promotional materials and free samples to physicians) their generic compounds. The primary means for one generic manufacturer to differentiate its product from another's is through price competition.[56] The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 6.     Inter-competitor contacts and communications

157.     ████████████████████████████████████████████

████████████████████████████████████████████

████████████████     Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings. As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[57]

158.     The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events. For example, Defendants Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which

---

[56] *See, e.g.,* GAO Report at 23 ("If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.").

[57] PaRR Report.

FILED WITH REDACTIONS – PUBLIC VERSION

they reached agreements to allocate customers, rig bids, and fix prices of doxycycline hyclate and glyburide.

159.    DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications. These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[58] The sheer number of companies implicated in the investigations highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion:

(a)    **Actavis**: In February 2016, Actavis's predecessor, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[59]

(b)    **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to the DOJ's generic drug investigation.[60] The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[61]

(c)    **Citron**:  In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting

---

[58] State AG Amended Complaint ¶ 7.

[59] Allergan, SEC 2015 Form 10-K (Feb. 26, 2016), at 27, *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm.

[60] Zeba Siddiqui, "India's Aurobindo shares hit nine-month low on US price-fixing lawsuit," Reuters (Dec 16, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV.

[61] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products." The Connecticut AG requested that Citron produce all documents produced to DOJ.[62]

(d)     **Dr. Reddy's**:  In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[63]

(e)     **Heritage**:  As a private company, Heritage is not required to make public disclosures. Nonetheless, in the wake of the criminal guilty pleas by two of its executives, Heritage confirmed that it is "fully cooperating" with DOJ[64] and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for a cartel violation.

(f)     **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[65] In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[66] In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular… digoxin tablets, terbutaline

---

[62] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm.

[63] Dr. Reddy's, SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17.

[64] Tom Schoenberg , David McLaughlin & Sophia Pearson, "U.S. Generic Drug Probe Seen Expanding After Guilty Pleas," Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe.

[65] Impax SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm.

[66] Impax SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm.

FILED WITH REDACTIONS – PUBLIC VERSION

sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[67]

(g)    **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price-fixing of digoxin.[68] On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[69]   On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[70]

(h)    **Mayne**:  On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena…seeking information relating to marketing, pricing and sales of select generic drugs" and that it had received a subpoena from the Connecticut AG seeking similar information.[71]   On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products. The investigation relating to Mayne Pharma

---

[67] Impax, SEC 2015 Form 10-K (Feb. 22, 2016), at F-53, *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm.

[68] Lannett press release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General.

[69] Lannett, SEC Form 10-Q (Nov. 6, 2014) at 16, *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm.

[70] Lannett, SEC Form 10-K (Aug. 27, 2015) at 18, *available at* http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

[71] Mayne Pharma, 2016 Annual Report (Aug. 25, 2016), at 75, *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[72]

(i)    **Mylan**:  In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to…generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to…certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[73] On Nov. 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[74]

(j)    **Par**: In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to digoxin and doxycycline.[75] In November 2015, Endo International plc, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation."[76] Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of

---

[72] Mayne Pharma, Update on DOJ Investigation (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf.

[73] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm.

[74] Mylan SEC Form 10-Q, at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm.

[75] Par Pharmaceuticals Companies, Inc., SEC 2014 Form 10-K (Mar. 12, 2015) at 37, *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

[76] Endo International plc, SEC Form 10-Q (March 31, 2016) at 30, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm.

FILED WITH REDACTIONS – PUBLIC VERSION

Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products, including Doxycycline Hyclate, Amitriptyline Hydrochloride, Doxazosin Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[77]

(k)     **Perrigo**:  On May 2, 2017, Perrigo disclosed that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[78]

(l)      **Sandoz**:  In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products…and related communications with competitors."[79]

(m)    **Sun**:  On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Sun) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents…relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[80]

(n)     **Taro**:  In September 2016, Taro disclosed that the Company "and two senior officers" received DOJ subpoenas seeking documents relating to "generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[81]

---

[77] *Id.* at 31.

[78] Perrigo Press Release (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation.

[79] Novartis 2016 Financial Report at 217, *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf.

[80] Sun Pharmaceuticals Indus., Ltd., BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf.

[81] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm.

**FILED WITH REDACTIONS – PUBLIC VERSION**

(o)   **Teva**: In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[82]

(p)   **Zydus**: Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[83]

## IX.   THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.   The Statutes of Limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy

160.   Plaintiffs had no knowledge of the conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of the government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for Pravastatin. And indeed, Defendants' disclosures regarding the government investigations did not indicate Pravastatin specifically.

161.   Plaintiffs are purchasers who indirectly purchased Pravastatin manufactured by one or more Defendants. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

162.   Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint. For example:

---

[82] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm.

[83] *See* Rupali Mukherjeel, "US polls, pricing pressure may hit Indian pharma cos," The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms.

**FILED WITH REDACTIONS – PUBLIC VERSION**

> (a)   Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws."[84]
>
> (b)   Par's Code of Conduct provides: "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business."[85]
>
> (c)   Novartis's (the parent of Sandoz) Code of Conduct provides: "We are committed to fair competition and will not breach competition laws and regulations."[86]

163.    It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

164.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.    Fraudulent concealment tolled the statutes of limitations**

165.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.

166.    As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for Pravastatin. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of Pravastatin they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Pravastatin. Defendants' false statements and

---

[84] Mylan Code of Business Conduct and Ethics, *available at* https://www.mylan.com/-/media/mylancom/files/code%20of%20business%20conduct%20and%20ethics.pdf.

[85] Par Code of Ethics, *available at* http://corpdocs.msci.com/ethics/eth_19100.pdf.

[86] Novartis Code of Conduct, *available at* https://www.novartis.com/sites/www.novartis.com/files/code-of-conduct-english.pdf.

60

FILED WITH REDACTIONS – PUBLIC VERSION

conduct concerning the prices of Pravastatin were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing Pravastatin at prices established by a free and fair market.

### 1. Active concealment of the conspiracy

167.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe. Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

168.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for Pravastatin.

169.    As explained in the State AG complaint, the nature of the generic drug industry— which allows for frequent and repeated face-to-face meetings among competitors—means that "[m]ost of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[87]

---

[87] State AG Amended Complaint ¶ 13.

**FILED WITH REDACTIONS – PUBLIC VERSION**

170.    These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic Pravastatin to inflated, supracompetitive levels.

### 2.    Plaintiffs exercised reasonable diligence

171.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the market to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

172.    Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

173.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct. Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

174.    For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

### X.    <u>CONTINUING VIOLATIONS</u>

175.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. As shown in the price charts

above, Defendants continue to benefit from the effects of the conspiratorial price increases, as prices have not returned to the stable levels seen before the steep increases. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XI.   DEFENDANTS' ANTITRUST VIOLATIONS

176.   During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for Pravastatin sold in the United States.

177.   In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of Pravastatin sold in the United States. These activities included the following:

(a)   Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of Pravastatin in the United States;

(b)   Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to allocate customers or rig bids for Pravastatin sold in the United States;

(c)   Agreeing during those meetings, conversations, and communications to allocate customers for Pravastatin sold in the United States;

(d)   Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for Pravastatin sold in the United States;

(e)   Submitting bids, withholding bids, and issuing price proposal in accordance with the agreements reached;

FILED WITH REDACTIONS – PUBLIC VERSION

(f)     Selling Pravastatin in the United States at collusive and noncompetitive prices; and

(g)     Accepting payment for Pravastatin sold in the United States at collusive and noncompetitive prices.

178.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

179.     During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased Pravastatin at inflated and supracompetitive prices.

180.     Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various IRP Damages Jurisdictions enumerated below.

181.     As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for Pravastatin than they would have paid in competitive markets.

182.     General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to independent pharmacists, who cannot negotiate their acquisition costs. Wholesalers passed on the inflated prices to Plaintiffs and members of the Class. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Pravastatin.

FILED WITH REDACTIONS – PUBLIC VERSION

183.    The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)  price competition in the market for Pravastatin has been artificially restrained;

(b)  prices for Pravastatin sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c)  purchasers of Pravastatin sold by Defendants have been deprived of the benefit of free and open competition in the market for Pravastatin.

## XII.    CLASS ACTION ALLEGATIONS

184.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

All privately held pharmacies in the United States and its territories that indirectly purchased Defendants' generic Pravastatin products (including 10, 20, 40, and 80 mg tablets) from May 1, 2013 through the present.

This class excludes:  (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all persons or entities who purchased Pravastatin products directly from defendants; (c) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (d) all pharmacies owned or operated by publicly traded companies.

185.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer

FILED WITH REDACTIONS – PUBLIC VERSION

protection laws of the states and territories listed below (the "IRP Damages Jurisdictions")[88] on behalf of the following class (the "Damages Class"):

> All privately held pharmacies in the IRP Damages Jurisdictions that indirectly purchased Defendants' generic Pravastatin products (including 10, 20, 40, and 80 mg tablets) from May 1, 2013 through the present.[89]
>
> This class excludes: (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all persons or entities who purchased Pravastatin products directly from defendants; (c) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (d) all pharmacies owned or operated by publicly traded companies.

186.   The Nationwide Class and the Damages Class are referred to herein as the "Classes."

187.   While Plaintiffs do not know the exact number of the members of the Classes, rosters of members of national independent pharmacy organizations indicate that there are at least 20,000 members in each class.

188.   Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

> (a)   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Pravastatin and/or

---

[88] The IRP Damages Jurisdictions, for purposes of this complaint, are: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming, Puerto Rico, and the U.S. Virgin Islands.

[89] Plaintiffs may seek to certify state classes rather than a single Damages Class. See ¶ 192.

**FILED WITH REDACTIONS – PUBLIC VERSION**

engaged in market allocation for generic Pravastatin sold in the United States;

(b)   The identity of the participants of the alleged conspiracy;

(c)   The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)   Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e)   Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)   Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g)   Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)   The effect of the alleged conspiracy on the prices of generic Pravastatin sold in the United States during the Class Period;

(i)   Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Pravastatin, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)   The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)   The appropriate class-wide measure of damages for the Damages Class.

189.   Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Pravastatin purchased indirectly from Defendants and/or

67

their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

190.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

191.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

192.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiffs reserve the discretion to certify the Damages Class as separate classes for each of the IRP Damages Jurisdictions or as separate classes for certain groups of IRP Damages Jurisdictions, should the Court's subsequent decisions in this case render that approach more efficient. Whether certified together or separately, the total number and identity of the members of the Damages Class would remain consistent.

**FILED WITH REDACTIONS – PUBLIC VERSION**

193.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

### XIII.   CAUSES OF ACTION

### FIRST COUNT

### Violation of Sections 1 and 3 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

194.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

195.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

196.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Pravastatin, thereby creating anticompetitive effects.

197.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Pravastatin.

198.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated independent pharmacies in the Nationwide Class who purchased generic Pravastatin have been harmed by being forced to pay inflated, supracompetitive prices for generic Pravastatin.

69

**FILED WITH REDACTIONS – PUBLIC VERSION**

199.     In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

200.     Defendants' conspiracy had the following effects, among others:

(a)     Price competition in the market for generic Pravastatin has been restrained, suppressed, and/or eliminated in the United States;

(b)     Prices for generic Pravastatin provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)     Plaintiffs and members of the Nationwide Class who purchased generic Pravastatin indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

201.     Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Pravastatin purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

202.     Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

203.     Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

70

FILED WITH REDACTIONS – PUBLIC VERSION

## SECOND COUNT

### Violation of State Antitrust Statutes[90]
### (on behalf of Plaintiffs and the Damages Class)

204.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

205.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Pravastatin in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

206.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Pravastatin and to allocate customers for generic Pravastatin in the United States.

207.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Pravastatin at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Pravastatin provided in the United States; and

(b)    participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

---

[90] Statutory antitrust violations are alleged herein for the following jurisdictions: Alabama, Arizona, California, Connecticut, District of Columbia, ~~Illinois~~, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

**FILED WITH REDACTIONS – PUBLIC VERSION**

208.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Pravastatin. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

209.    In addition, defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiffs and the members of the Damages Class.

210.    Accordingly, plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

211.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes:

212.    **Alabama:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-5-60, et seq. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Pravastatin was restrained, suppressed, and eliminated throughout Alabama; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Alabama. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Alabama Code § 6-5-60, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Alabama Code § 6-5-60, et seq.

72

FILED WITH REDACTIONS – PUBLIC VERSION

213.    **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, et seq. Defendants' combination and conspiracy had the following effects: (1) price competition for generic Pravastatin was restrained, suppressed, and eliminated throughout Arizona; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, et seq.

214.    **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 et seq. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Pravastatin at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Pravastatin. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and

73

course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Pravastatin. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic Pravastatin has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Pravastatin provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Pravastatin indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Pravastatin than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

215. **District of Columbia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, et seq. Defendants' combination and conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Pravastatin in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and

FILED WITH REDACTIONS – PUBLIC VERSION

(4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Pravastatin in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Pravastatin, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, et seq.

216.   **Illinois:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, et seq.) Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.[91]

---

[91] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

**FILED WITH REDACTIONS – PUBLIC VERSION**

217. **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, et seq.

218. **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, et seq. Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Pravastatin, increasing the prices of generic Pravastatin, preventing competition in the sale of generic Pravastatin, or binding themselves not to sell generic Pravastatin, in a manner that established the price of generic Pravastatin and precluded free and unrestricted competition among themselves in the sale of generic Pravastatin, in violation of Kan. Stat. Ann. § 50-101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, et seq.

**FILED WITH REDACTIONS – PUBLIC VERSION**

219. **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, et seq.) Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, et seq.

220. **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, et seq.

221. **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained,

**FILED WITH REDACTIONS – PUBLIC VERSION**

suppressed, and eliminated throughout Minnesota; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, et seq.

222.    **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, et seq. Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, et seq.

FILED WITH REDACTIONS – PUBLIC VERSION

223.  **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, et seq.

224.  **Nevada:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, et seq.

**FILED WITH REDACTIONS – PUBLIC VERSION**

225.     **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, et seq.

226.     **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, et seq.

FILED WITH REDACTIONS – PUBLIC VERSION

227.    **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Law § 340, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New York General Business Law § 340, et seq. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, et seq.

228.    **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade

**FILED WITH REDACTIONS – PUBLIC VERSION**

in violation of North Carolina Gen. Stat. § 75-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, et. seq.

229.   **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, et seq.

230.   **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised

Statutes § 646.705, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, et seq.

231.   **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, et seq.

232.   **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade

in violation of South Dakota Codified Laws Ann. § 37-1-3.1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, et seq.

233.    **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, et seq.

234.    **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code

Annotated § 76-10-3101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, et seq.

235.    **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, et seq.

236.    **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, et seq. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have

entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, et seq.

237.   **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, et seq. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin.  During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, et seq.

236a. **Connecticut:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-26 and § 35-28. Defendants' combination or conspiracy described above had the following effects during the class period: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Pravastatin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut. As a direct and proximate result of Defendants' unlawful conduct,

**FILED WITH REDACTIONS – PUBLIC VERSION**

Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 10, 2017, and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Conn. Gen. Stat. § 35-34 and § 35-35. Plaintiffs have provided a copy of this complaint to the Attorney General as required by Conn. Gen. Stat. § 35-37.

236b.  **Maryland:** Defendants have "unreasonably restrain[ed] trade" by "contract, combination or conspiracy" in violation of Md. Code, Com. Law § 11-204(a)(1). During the class period, throughout Maryland, Defendants' combination or conspiracy restrained, suppressed, and eliminated price competition for generic Pravastatin and raised, fixed, maintained, and stabilized generic Pravastatin prices at artificially high levels. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after October 1, 2017, and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Md. Code, Com. Law § 11-209(b).

238.  **As to All Jurisdictions Above:** Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Pravastatin than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

**FILED WITH REDACTIONS – PUBLIC VERSION**

239.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

240.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD COUNT

### Violation of State Consumer Protection Statutes[92]
### (on behalf of Plaintiffs and the Damages Class)

241.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

242.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

243.    **Alaska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, et seq.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Alaska and took efforts to conceal

---

[92] Statutory consumer protection / deceptive trade violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, Florida, ~~Georgia,~~ ~~Michigan,~~ Minnesota, Nebraska, ~~Nevada,~~ New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, ~~South Carolina,~~ South Dakota, ~~West Virginia,~~ Wisconsin and the U.S. Virgin Islands.

**FILED WITH REDACTIONS – PUBLIC VERSION**

their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

244.   **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, et seq. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

89

Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

245.    **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, et seq. During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Pravastatin in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, et seq. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, et seq., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, et seq. of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, et seq. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Pravastatin in the State of California within the meaning of § 17200,

90

California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Pravastatin. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

246. **Colorado:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, et seq.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury.

FILED WITH REDACTIONS – PUBLIC VERSION

Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, et seq., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

247.   **Delaware:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, et seq.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment

of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

248.   **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

249.   ~~Georgia: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and~~

members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia Code § 10-1-370, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.[93]

250.  **Michigan:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, et seq.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining,

---

[93] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

~~at artificial and non competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.~~

251.   **Minnesota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, et seq.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs

95

as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, et seq., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

252.   **Nebraska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, et seq.  Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed generic Pravastatin in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

253.   ~~**Nevada:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, et seq.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive~~

**FILED WITH REDACTIONS – PUBLIC VERSION**

~~levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Nevada.~~
~~Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages~~
~~Class concerning Defendants' unlawful activities and artificially inflated prices for generic~~
~~Pravastatin. Defendants misrepresented to all purchasers during the Class Period that Defendants'~~
~~generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the~~
~~following effects: (1) generic Pravastatin price competition was restrained, suppressed, and~~
~~eliminated throughout Nevada; (2) generic Pravastatin prices were raised, fixed, maintained, and~~
~~stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants'~~
~~illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and~~
~~proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class~~
~~suffered an ascertainable loss of money or property as a result of Defendants' use or employment~~
~~of unconscionable and deceptive commercial practices as set forth above. That loss was caused by~~
~~Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including~~
~~their affirmative misrepresentations and omissions concerning the price of generic Pravastatin,~~
~~likely misled all purchasers acting reasonably under the circumstances to believe that they were~~
~~purchasing generic Pravastatin at prices set by a free and fair market. Defendants' misleading~~
~~conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, et seq.,~~
~~and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that~~
~~statute.~~

254. **New Hampshire:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, et seq. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated

throughout New Hampshire; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants marketed, sold, or distributed generic Pravastatin in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

255.    **New Jersey:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, et seq.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of

Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

256.   **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Pravastatin were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Pravastatin as set forth in N.M.S.A., § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Pravastatin because they were unaware of the unlawful overcharge, and there was no alternative

source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Pravastatin, including their illegal conspiracy to secretly fix the price of generic Pravastatin at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Pravastatin. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

257. **New York:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-

conspirators made public statements about the prices of generic Pravastatin that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Pravastatin; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Pravastatin were misled to believe that they were paying a fair price for generic Pravastatin or the price increases for generic Pravastatin were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Pravastatin would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Pravastatin would have a broad impact, causing consumer class members who indirectly purchased generic Pravastatin to be injured by paying more for generic Pravastatin than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants marketed, sold, or distributed generic Pravastatin in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Pravastatin in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

258.   **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Pravastatin created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in

a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants marketed, sold, or distributed generic Pravastatin in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Pravastatin in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

259.   **North Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, et seq.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price

competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

260.   **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened

~~with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or~~ ~~practices in violation of S.C. Code Ann. § 39-5-10, et seq., and, accordingly, Plaintiffs and the~~ ~~members of the Damages Class seek all relief available under that statute.~~[94]

261.    **South Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, et seq.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct,    as    described    herein.    Defendants'    deception,    including    their    affirmative

---

[94] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

FILED WITH REDACTIONS – PUBLIC VERSION

misrepresentations and omissions concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Pravastatin they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

262. **West Virginia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or

106

~~property as a result of Defendants' use or employment of unconscionable and deceptive~~

~~commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive~~

~~conduct, as described herein. Defendants' deception, including their affirmative~~

~~misrepresentations and omissions concerning the price of generic Pravastatin, likely misled all~~

~~purchasers acting reasonably under the circumstances to believe that they were purchasing generic~~

~~Pravastatin at prices set by a free and fair market. Defendants' affirmative misrepresentations and~~

~~omissions constitute information important to Plaintiffs and members of the Damages Class as~~

~~they related to the cost of generic Pravastatin they purchased. Defendants have engaged in unfair~~

~~competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, et~~

~~seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under~~

~~that statute.~~[95]

263.   **Wisconsin:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels

---

[95] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

FILED WITH REDACTIONS – PUBLIC VERSION

throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Pravastatin they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

264.   **U.S. Virgin Islands:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, et seq.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Pravastatin were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Pravastatin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Pravastatin prices were competitive and fair. Defendants' unlawful conduct had the

FILED WITH REDACTIONS – PUBLIC VERSION

following effects: (1) generic Pravastatin price competition was restrained, suppressed, and eliminated throughout U.S.V.I.; (2) generic Pravastatin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I.. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Pravastatin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Pravastatin at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Pravastatin they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

## FOURTH COUNT

### Unjust Enrichment[96]
### (on behalf of Plaintiffs and the Damages Class)

265.   Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

---

[96] Unjust enrichment claims are alleged herein under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North

FILED WITH REDACTIONS – PUBLIC VERSION

266.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint. This claim is brought under the equity precedents of each of the IRP Damages Jurisdictions.

267.    Defendants have unlawfully benefited from their sales of generic Pravastatin because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged privately held pharmacies, who purchased generic Pravastatin at prices that were more than they would have been but for Defendants' unlawful actions.

268.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the Damages Class.

269.    Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

270.    Defendants have been enriched by revenue resulting from unlawful overcharges for generic Pravastatin while Plaintiffs have been impoverished by the overcharges they paid for generic Pravastatin imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' impoverishment are connected.

271.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit,

---

Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

**FILED WITH REDACTIONS – PUBLIC VERSION**

and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

272.    Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

273.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of generic Pravastatin.

274.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of generic Pravastatin are ascertainable by review of sales records.

275.    It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of generic Pravastatin.

276.    It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased generic Pravastatin, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

277.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for generic Pravastatin is a direct and proximate result of Defendants' unlawful practices.

FILED WITH REDACTIONS – PUBLIC VERSION

278.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

279.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for generic Pravastatin derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

280.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as generic Pravastatin prices remain inflated above pre-conspiracy levels.

281.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of generic Pravastatin.

282.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of generic Pravastatin by Plaintiffs and the Damages Class. Plaintiffs and the Damages Class have no adequate remedy at law.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment for the following relief:

FILED WITH REDACTIONS – PUBLIC VERSION

A.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a per se violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

C.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

D.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

E.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis;

F.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

H.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## XV.   <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

Dated: April 1, 2019                                  Respectfully submitted,

                                                      <u>/s/  Jonathan W. Cuneo</u>

Peter Gil-Montllor                                    Jonathan W. Cuneo
Christian Hudson                                      Joel Davidow
**CUNEO, GILBERT & LADUCA LLP**                       Daniel Cohen
16 Court Street, Suite 1012                           Victoria Romanenko
Brooklyn, NY 11241                                    Blaine Finley
202-789-3960                                          **CUNEO, GILBERT & LADUCA LLP**
pgil-montllor@cuneolaw.com                            4725 Wisconsin Ave., NW Suite 200
                                                      Washington, DC 20016
                                                      202-789-3960
                                                      jonc@cuneolaw.com

                                                      *Lead Counsel for the Indirect Reseller Plaintiffs*

**FILED WITH REDACTIONS – PUBLIC VERSION**